355 So.2d 1 (1977)
DI VINCENTI BROTHERS, INC.
v.
LIVINGSTON PARISH SCHOOL BOARD et al.
No. 11170.
Court of Appeal of Louisiana, First Circuit.
March 21, 1977.
On Rehearing December 28, 1977.
Rehearing Denied February 13, 1978.
Writ Refused March 31, 1978.
Karl W. Cavanaugh, Denham Springs, for plaintiff.
J. Donald Cascio, Denham Springs, for defendants.
Before LANDRY, EDWARDS and COLE, JJ.
*2 COLE, Judge.
This suit by a wholesale food distributor seeks to have the Livingston Parish School Board enjoined from removing it from the list of those allowed to bid on supplies for the Board's school lunch program.
For several years prior to the 1974-75 school year, plaintiff has been one of the suppliers of food to that School Board. Prior to that school year, the Board's food service director had informed all such distributors that they would have to comply with the state certification and inspection program for meat. During that year, it came to the attention of the director that Di Vincenti was delivering uncertified meats to some of the schools, and it was removed at that time from the list of bidders.
Thereafter, the plaintiff met with the School Board and its suspension was amicably resolved. However, it was again removed from the list of suppliers in February, 1976, because it was found to have resumed the delivery of meat which did not have the required certification.
This litigation followed that action. Made defendants were the School Board and its individual members. A plea of immunity and a peremptory exception were filed on behalf of the Board and the members respectively. Without a ruling on those exceptions, a hearing was had on the merits of the injunctive relief sought, and judgment was subsequently rendered in favor of the defendants, dismissing the plaintiff's suit.
The School Board again here maintains that its plea of immunity should be sustained because the plaintiff did not obtain legislative authorization for its suit. That argument is correct.
This suit was filed on March 17, 1976, and alleges a cause of action which arose on February 20th of that year. Therefore, this suit is governed by the Louisiana Constitution of 1974 which became effective at midnight, December 31, 1974.
Article 12, § 10 of that document provides, in part:
"(A) No Immunity in Contract and Tort. Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
"(B) Waiver in Other Suits. The legislature may authorize other suits against the state, a state agency, or a political subdivision. A measure authorizing suit shall waive immunity from suit and liability."
See, also, Article 14, § 33 of the document.
Therefore, the present inquiry is whether this suit is one in either contract or for injury to person or property requiring no legislative waiver of immunity, or whether it is one to be governed by Article 12, § 10(B).
In considering a similar issue in Hill v. North-Central Area Vocational Technical School, La.App., 310 So.2d 104 (1975), our Supreme Court, with respect to interpretative analysis of what constitutes a suit in contract, stated:
"A contract is an agreement, by which one person obligates himself to another, to give, to do or permit, or not to do something. La.C.C. art. 1761. A contract consists of a proposition and the consent to it, and when one proposes and the other assents, the obligation is complete. La.C.C. arts. 1800, 1803. A bilateral or reciprocal contract exists when the parties expressly enter into mutual engagements. La.C.C. art. 1779 provides:
`Four requisites are necessary to the validity of a contract:
`1. Parties legally capable of contracting.
`2. Their consent legally given.
`3. A certain object, which forms the matter of agreement.
`4. A lawful purpose.'" (310 So.2d at 106)
This suit seeks to obtain the right to contract with the defendant School Board. It does not allege that a contract was in effect at the time of the institution of this litigation or that any agreement has been *3 breached. Additionally, the plaintiff at this time seeks no damages for injury. To the contrary, it has specifically reserved its right to amend its petition at a later time to claim monetary damages. We note this statement on page 2 of appellant's supplemental brief in this Court:
"The relief plaintiff seeks, at this point, is a mandatory injunction to compel the defendant board, its members and certain named employees to comply with the law, particularly the Public Contracts Law. * * *"
That summation accurately reflects the nature of the cause of action asserted at this time. To characterize this matter as a contractual dispute or as a claim for injury to person or property would require a distortion of that terminology and of the intent of the Constitution. Further, subsection (B) of § 10 which was obviously inserted to require a legislative waiver for "Other Suits" would be rendered meaningless.
In reaching the conclusion that we do not have before us a suit in contract or for injury to person or property for which there is no immunity, we have considered source provisions of the Constitution of 1921 and the intent of the drafters of Article 12, § 10 of the Constitution of 1974. Article 3, § 35 and Article 19, § 26 of the Constitution of 1921; Official Transcript of the Constitutional Convention, 1973, pp. 31-95 of the 20th day of the proceedings and pp. 7-46 of the 21st day of the proceedings. Additionally, we find a statutory waiver of immunity as regards school boards only for suits for the enforcement of contracts entered into by a school board or for recovery of damages for the breach thereof. LSA-R.S. 17:51. This statute is obviously insufficient to afford the further constitutional right to sue for injury to person or property, but it is not a legislative waiver of immunity from "Other Suits" against a school board. Still further, we note that the Legislature in fulfilling the mandate of Article 12, § 10(C) to provide a procedure for suits against the state, a state agency, or a political subdivision, specifically defines "political subdivision" to include a school board. LSA-R.S. 13:5102.
The character of the action given by plaintiff in his petition, an analysis of the entire pleading, and the nature of the relief prayed for, when considered within the context of the extensive debate engaged in by the drafters of Article 12, § 10 of the Constitution of 1974 (Official Transcript, supra ), leads us to conclude that the instant action is neither ex contractu nor ex delicto but falls within the category of "Other Suits" intended to be provided for by Article 12, § 10(B).
As a further argument against the dismissal of the present action, the appellant also maintains that the "Plea of Immunity" filed by the School Board is an improper procedural device for asserting this issue. As we noted in Huckabay v. Netterville, 263 So.2d 113 (La.App. 1st Cir. 1972), the exception of no right of action has been specifically approved by the Supreme Court in cases involving similar issues. See, also, Tucker v. Edwards, 214 La. 560, 38 So.2d 241 (1948), and Weinstein, Bronfin and Heller v. LeBlanc, 249 La. 936, 192 So.2d 130 (1966).
As in Huckabay, we now supply the exception of no right of action as authorized by Louisiana Code of Civil Procedure Article 927.
The peremptory exception filed herein is also maintainable as it applies to the individual School Board members who were made defendants in this matter due to official acts only. In Tucker v. Edwards, supra, the Supreme Court commented:
"With respect to non-feasance by a public officer the law appears to be:
`A public officer who knowingly or negligently fails or refuses to do a ministerial act which the law or legal authority absolutely requires him to do may be compelled to respond in damages to one to whom performance was owing, to the extent of the injury proximately caused by the nonperformance. Honest intentions and a mistake as to his duty will not excuse the offender. On the other hand, failure to perform discretionary and quasi-judicial powers does not in general subject *4 an officer to personal liability so long as he is acting within the scope of his authority or jurisdiction. * * *' 43 American Jurisprudence, verbo Public Officers, Section 278.
"Further, in the succeeding Section 279 we find:
`As is elsewhere mentioned in this article, officers performing discretionary duties may become personally liable for negligent acts in excess of their authority. But no action lies for the negligent performance of an official duty which is judicial or discretionary in its nature, however gross or corrupt such neglect may be, so long as the acts are wholly within the officer's jurisdiction. The remedy in all such cases is by indictment or impeachment. * * *'
"Continuing, that authority states in Section 280, with reference to liability for acts of board members, as follows:
`In a number of cases, public officers or the sureties on their bonds have been held personally liable for resulting damage where they fail to perform a duty expressly and positively imposed on a body of which they are members, or where they violate express provisions of law forbidding their action, or where they otherwise cause injury by violating or disobeying the law, although they act in concert as a body. * * * On the other hand, it is held in various cases that the neglect or breach of duty is the default of the board and not of the individuals composing it, and that the members may not be held personally liable. If there is refusal to exercise the power of such body, it is the refusal of the body, and not of the individuals composing it. The official action of its different members is merged into the official action of the board itself as an entity. * * * `
"This non-liability doctrine was considered and applied in Monnier v. Godbold et al., 116 La. 165, 40 So. 604, 608, 5 L.R.A.,N.S., 463, 7 Ann.Cas. 768, the court commenting therein:
`In the case before us the act complained of was not one of commission, but of omission (a refusal to grant a certificate), and the action or nonaction of the corporate body was one with which the defendants were connected exclusively in their positions as members of the board. Nothing which they did or could do, simply as individuals, could alter the situation. As individuals, they were strangers to the act complained of. The official action of the different members became merged in the ultimate action of the board itself as an entity.'" (38 So.2d at 244)
Therefore, for the reasons herein assigned, the appellant's suit is dismissed at its costs.
AFFIRMED.

ON REHEARING
Before LANDRY, SARTAIN, ELLIS, BLANCHE and LOTTINGER, JJ.
ELLIS, Judge.
In this suit, plaintiff Di Vincenti Brothers, Inc. is seeking a mandatory injunction to compel the Livingston Parish School Board; the members thereof; Carol P. Legette, Superintendent of Schools of Livingston Parish; and Carolyn Dunnington, Food Service Supervisor for the Board, "to procure provisions for the School Lunch Program in Livingston Parish by exact compliance with R.S. 38:2211, R.S. 17:195, and 7 C.F.R. 210, Section 19A uniformly applied to all vendors and prospective vendors, specifically, that provisions be procured by award of the contract (to) the lowest responsible bidder quoting wholesale prices after the advertisements required by law, and commanding and ordering the defendants and each of them to adopt and implement policies to assure uniform treatment of all vendors with respect to customer complaints."
To the petition, the individual defendants filed a peremptory exception, alleging that, as officers and employees of the School Board, they could not personally grant the relief sought. The School Board filed a peremptory exception claiming immunity *5 from suit under R.S. 17:51 and Article 12, Section 10 of the Constitution of 1974.
The record does not reveal that the trial court ever considered or ruled on the exceptions. A hearing was held on the application for a preliminary injunction, after which, for written reasons, the injunction was denied. Subsequently, by stipulation, the matter was submitted on the same evidence for judgment on the prayer for a permanent injunction. The court denied the injunction and dismissed plaintiff's suit on its merits. From that judgment, plaintiff has appealed. Defendants have answered the appeal re-urging both of their exceptions.
On our initial hearing, a unanimous panel ruled that both exceptions should have been sustained, and dismissed the suit on that ground, thereby affirming the judgment below. Subsequently, on application of plaintiff, a rehearing was granted, which eventually was argued before this five judge panel.
With respect to the exceptions filed by the defendants, we are now of the opinion that both should have been overruled. It has long been recognized in Louisiana that a suit against a public body or public officer or employee to compel the legal performance of their ministerial duties is not considered as a suit against the state, since no interest of the State is placed in jeopardy by such action. See State v. Nicholls, 42 La.Ann. 209, 7 So. 738 (1890); Richardson v. Liberty Oil Co., 143 La. 130, 78 So. 326 (1918); Abbott v. Louisiana Securities Comm., 149 La. 354, 89 So. 211 (1921); State v. Baynard, 15 So.2d 649 (La.App. 1st Cir. 1943); State v. City of New Orleans, 209 So.2d 141 (La.App. 4th Cir. 1968); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1907).
The petition in this case alleges that the purchasing practices in the Livingston Parish School Lunch Program are not conducted according to law. Taxpayers and other interested parties have a right to compel the performance of such legal duties without first having to obtain legislative consent. As the court said in Grimble v. Avoyelles Parish Police Jury, 212 So.2d 496, 498 (La.App. 3rd Cir. 1968):
"To hold otherwise would encourage irresponsible government management and would deny plaintiffs an effective remedy where the statutory law provides them a particular right and imposes a particular obligation upon defendant."
The evidence in this case shows that the school lunch program in Livingston Parish is administered by Carolyn Dunnington, the Food Service Director. About $1,000,000.00 was expended on the food service program in 1975-76, in twenty-two schools. Four times during each school year a universal menu is prepared by Miss Dunnington and distributed to the school lunch managers at the various schools. The managers estimate the amount of provisions that each will need for the period of time covered. Based on these estimates, Miss Dunnington then tabulates the needs of the Food Service Division, and mails it out to a list of vendors of food supplies, who then submit bids on the various items, giving a bid price and a brand name for each item. Miss Dunnington accepts the lowest bid for the highest quality, and notifies the successful bidders and the various lunch managers. The managers then order the products as they are needed from the successful bidders.
Detailed instructions concerning the bidding system are furnished to all prospective bidders and to the lunch managers. Detailed specifications on all products to be furnished are given as well. Among these is a requirement that all meat must be inspected and certified by state inspections. Bids on most products are obtained for two or three month periods, but, because of price fluctuations, monthly bids are obtained on meat and produce.
Miss Dunnington testified that, in awarding bids, a number of factors must be considered other than price. In purchasing chicken, although bids are asked on thighs, legs and breasts, the contract is generally awarded to one supplier, even though he might not be the low bidder for each item, *6 because of delivery and preparation problems. The same is true of fish portions, which are bid in three different sizes, and dried beans, which are delivered in bags of different sizes. She also testified that some brands are not purchased because the children do not like the product and will not eat it, and that a bid for such a product would be rejected, even if it were the lowest.
The Livingston Parish Food Service Division does not advertise for bids. Generally, bid requests are sent to any vendors who request that a quotation form be sent them. At the time of the controversy herein, five or six vendors were on the list. Miss Dunnington testified that she had one additional vendor who would be added to the list for the coming year, but that she knew of no other vendors who would submit bids at that time.
Prior to February 20, 1976, Di Vincenti Brothers, Inc. had been on the list of vendors who were sent bid requests. On that date, Miss Dunnington notified plaintiff that it was being removed from the list for the school year 1975-76 for an alleged failure to furnish meat which was Louisiana State Certified. This suit followed.
The major thrust of plaintiff's case is that the School Board must abide by the provisions of R.S. 38:2211 in making its food purchases. In pertinent part, that act provides:
"All public work exceeding the sum of five thousand dollars including both labor and materials to be done by the state of Louisiana, any public corporation or political subdivision of the state and all purchases of materials or supplies exceeding the sum of two thousand five hundred dollars to be paid out of public funds shall be advertised and let by contract to the lowest responsible bidder who had bid according to the contract, plans and specifications as advertised and no such public work shall be done and no such purchase shall be made except as provided in this Part."
Defendants, on the other hand, claim that the law applicable is R.S. 17:195, which provides:
"School boards shall be required to purchase food wholesale at the lowest prices quoted for good quality products or at prices no greater than the wholesale rate for the same item."
Defendants contend that, so long as R.S. 17:195 is complied with, there is no necessity for compliance with R.S. 38:2211, citing the principle that the particular law will prevail over the general. We note that compliance with R.S. 17:195 satisfies the requirements of applicable federal regulations, 7 C.F.R. 210.19A.
In view of the specialized nature of the purchase of food products, many of which are perishable; the fluctuating demand for various products in the specific schools; and the fluctuating price levels of food products, we think it reasonable for the legislature to have exempted these purchases from the requirements of R.S. 38:2211. We hold that the School Board is not required to advertise for bids for the purchase of goods necessary to the school lunch program.
R.S. 17:195 requires that food purchases be made "wholesale at the lowest prices quoted for good quality products or at prices no greater than the wholesale rate for the same item." Miss Dunnington testified that it was her practice to accept the lowest bid for the highest quality product. She did not feel that she was required to accept the lowest bid on any item.
The record further shows that plaintiff was removed from the bidders list in the 1974-75 school year, for delivery of uncertified meat. After an appearance before the School Board, plaintiff was reinstated on the list, on "probation" and advised that it would be permanently removed from the list if it happened again. The record is clear that plaintiff continued to deliver uncertified meat to the various schools. Other complaints made relative to plaintiff's service were that it sometimes switched brands or products; that it delivered substandard products; that it delivered the wrong product; and that it failed or was *7 unable to deliver products for which it had been granted the bid.
In February, 1976, when it was discovered that Di Vincenti had delivered uncertified meats, it was also discovered that Pons, the other meat vendor on the list, had done the same. Because Di Vincenti had previously been put on probation for that offense, the same treatment was accorded to Pons at the same time that plaintiff was removed from the bid list.
The trial judge found that plaintiff had failed to prove that the School Board was not conducting its food purchasing program in accordance with R.S. 17:195. We think this legal conclusion is correct. The evidence shows that there can exist circumstances under which it is impractical or undesirable to accept the lowest bid for a particular item. Under such circumstances, we think that R.S. 17:195 gives the School Board the discretion to accept other, higher bids, so long as the price does not exceed the prevailing wholesale rate for those items.
We therefore agree with the trial judge that the plaintiff has failed to show any violation of the law inherent in the food purchasing procedures followed by the School Board. Since the Board is in compliance with the law, plaintiff is not entitled to the relief sought herein.
The judgment appealed from is therefore affirmed, at plaintiff's cost.
AFFIRMED.
LANDRY, Judge, concurring in part and dissenting in part.
I disagree with the majority holding that the defense of sovereign immunity is unavailable to defendant school board because plaintiff's action for a mandatory injunction to compel compliance with federal and state public bid statutes is not an action against the state or an agency of the state but is one against a state official in his individual capacity seeking performance of a ministerial duty. Granted, our jurisprudence so holds as evidenced by the authorities cited in the majority opinion. In my judgment, the basis for these decisions appears most tenuous and dubious. They appear to be based on the concept that in such cases the state has no direct interest to be affected. I disagree with this reasoning.
In the present case, Appellant seeks to change the procedure presently employed by defendant board in its award of contracts for purchases of food for the board's school lunch program. There can be no doubt that the board is an agency of the state; see La.R.S. 13:5102(B). The board defends this action in its own name. The board has not defended on the ground that it lacks interest in the subject matter of the suit. On the contrary, the board has chosen to remain in the suit and to rely on what amounts to a peremptory defense asserted by a party in interest.
In my opinion, the majority reasoning becomes less convincing in the light of the 1974 Constitution's sovereign immunity provision contained in Article 12, Section 10(A). The article provides that there shall be no sovereign immunity in contract or tort but that in all other instances sovereign immunity shall exist and apply. The majority opinion avoids the necessity of determining whether the suit is in contract or tort, in which case sovereign immunity does not apply, by the simple expedient of deciding that the case is not one against the state, but rather is one against the employee alone. To say that the state has no interest in the outcome of this litigation and has no interest which may be placed in jeopardy by the outcome of this action, completely ignores the fundamental nature of Appellant's claims. In effect, Appellant seeks interpretation of statutes and laws pursuant to which the school board, as an agency of the state, must operate. Interpretation of the applicable laws will determine the board's actions, rights and obligations insofar as subject statutes are concerned.
The majority view also appears dependent on the outcome of the litigation. In this respect, the difficulty lies in the fact that the remedy available to plaintiff must be judicially determined before it can be decided whether or not the action is one *8 against the state agency or an officer in his individual capacity. This approach leaves the state in the action as a party until this issue is determined at the end of the trial. It appears basic to me that the issue of sovereign immunity, to be of avail when applicable, must be determined at the outset of the lawsuit before any issue whatsoever may be litigated with the party asserting the defense of sovereign immunity. Presumably, the majority would have decided differently, if Appellant had requested a declaratory judgment prescribing his rights rather than a mandatory injunction. In either event, the interest of the state in the outcome is identical.
I find the problem confounded further because the present constitutional provision defines sovereign immunity and its exceptions in terms of the theory of the cause of action asserted, and not the nature of the remedy requested. The majority opinion, however, avoids application of the constitutional concept of the theory of the action urged, by resorting to the class of remedy sought by plaintiff. Pursuing the majority approach would require severance in the event plaintiff in one action sought to enjoin the employee and also requested damages of the board. In this instance, I note that while Appellant did not pray for damages, he expressly reserved his right to request damages in another suit.
In my judgment, the majority opinion defers a meaningful interpretation of the sovereign immunity provision of our 1974 Constitution. I believe a better result would be achieved by a holding that the action asserted is one in tort, as I shall attempt to demonstrate.
Our concept of sovereign immunity is jurisprudential in origin. For an exhaustive treatment of the subject, see Board of Commissioners for the Port of New Orleans v. Splendour Shipping and Enterprises Company, Inc., 273 So.2d 19 (La.1973). Splendour judicially terminated the doctrine of sovereign immunity from suit and liability in tort as established by prior case law.
Sovereign immunity, in suits in contract only, was terminated for certain named special state agencies, including parish school boards, by Louisiana Constitution of 1921, Article 19, Section 26 as amended in 1956. The difficult question of whether Article 19, Section 26 precluded application of Splendour to those agencies listed in that section was avoided in Hill v. North-Central Area Vocational Technical School, 310 So.2d 104 (La.1975), by classifying the cause of action as one in contract. The issue need not be considered now, as Article 12, Section 10 of the 1974 Constitution has rendered it moot.
This is an initial interpretation of La. Const.1974, Article 12, Section 10. The debate on the article during the constitutional convention of 1974 indicates intent to clothe the sovereign with immunity from suit and liability in all cases except suits in tort and contract. The convention rejected amendments to proposed Article 12, Section 10, which would have terminated the doctrine of sovereign immunity in its entirety. The debate also discloses a majority rejection of a proposal, which merely protected the state and its agencies against seizure of public assets to satisfy judgments against the sovereign, by requiring that judgments against the sovereign be satisfied only out of funds appropriated for such a purpose. The clearly expressed intent was to adopt the doctrine of sovereign immunity as part of our basic law, and to waive that immunity in the field of contracts and torts as exceptions to the general rule. The following remarks appear at page 40 of the 21st convention day:
"I have come with an exception first, and any and all other actions against the state would require the approval of your legislative body. The only thing that I'm saying that we do not need your approval to institute is suits in contracts, suits for personal injury and suits for property damage. All other suits would require the old legislative approval method."
In response to a question concerning the possible extension of sovereign immunity beyond its application prior to the convention, the delegate replied:

*9 "I'm not sure whether or not it would be enlarged to that extent, but I will say that that would certainly be left to judicial interpretation, and the only thing which is specifically set forth where there is no immunity would be the contract suit, the suit for personal injury or the suit for property damage. All other suits would, of course, have to go to the legislature and seek the legislative approval before filing suit." (Emphasis supplied by the court).
The amendment finally adopted was consistently referred to as a compromise. The delegates repeatedly and steadfastly refused to accept either a broader renunciation of sovereign immunity or additional exceptions to the general policy declared in Paragraph (A). Only by restricting waiver of the doctrine in cases of contracts and torts could opponents of sovereign immunity obtain any waiver at all.
Other evidence of intent to change the existing concept of sovereign immunity is indicated in the convention's failure to maintain as statutory material the provision of La.Const.1921, Article 3, Section 35, which permitted suit against the sovereign whenever authorized, by legislation previously or subsequently enacted. Elimination of this provision indicates intent to obviate the effect of Hamilton v. City of Shreveport, 247 La. 784, 174 So.2d 529 (1965). It is also significant that the convention failed to maintain, as statutory material, the provisions of La.Const.1921, Article XIX, Section 26, vesting specified state agencies with sovereign immunity in all instances save contracts.
Therefore, the pertinent constitutional provision establishes sovereign immunity from both suit and liability in all classes of action except torts and contracts. The query then becomes, does Appellant's action fall into either class? The averred conduct, as set forth in the majority opinion, allegedly violates: (1) The Public Bid Law, La.R.S. 38:2211 requiring advertisement for bids for the purchase of materials and supplies over $2,500.00 and award of the contract to the lowest bidder; (2) La.R.S. 17:195 mandating the purchase of provisions at "wholesale at the lowest prices quoted for quality products or at a price no greater than the wholesale rate for the same item"; and, (3) Federal regulations issued by the U.S. Department of Agriculture, found at 7 C.F.R. 210.19, Sub-section 19a.
Claiming status as a vendor and taxpayer, Appellant alleges he will suffer irreparable injury and loss unless Defendants are restrained from further such illegal, discriminatory activity and are mandated to comply with applicable state and federal laws. Past and future financial loss is claimed, including possible loss of a quantity of canned goods purchased specially to fill an order for Defendants, and which will be a total loss if Defendants refuse to purchase the goods when Appellant is low bidder for these particular items.
Appellant prays for a mandatory injunction compelling Defendants to comply with the law and to adopt and implement policies which insure fair, equal and uniform treatment of all vendors.
Appellant charges Defendants essentially with violation of a statutory duty resulting in loss and damage to Appellant, which activity will cause Appellant further loss if not restrained.
In substance, La.R.S. 38:2211 requires advertisement for bids for the purchases of materials and supplies in amounts exceeding $2,500.00, and the award of the purchase to the lowest responsible bidder. La.R.S. 17:195 applies specifically to purchases by school boards in the operation of their school lunch programs.
The allegations of Appellant's petition characterize this action as one in tort. La.C.C. Article 1760 provides:
"Civil obligations, in relation to their origin, are of two kinds:
1. Such as are created by operation of law.
2. Such as arise from the consent of the parties who are bound by them, which are called contracts or conventional obligations."
*10 The civil obligations established by law are further divided by the provisions of La.C.C. Article 2292, which recites:
"Certain obligations are contracted without any agreement, either on the part of the person bound or of him in whose favor the obligation takes place.
Some are imposed by the sole authority of the laws, others from an act done by the party obliged, or in his favor.
The first are such engagements as result from tutorship, curatorship, neighborhood, common property, the acquisition of an inheritance, and other cases of a like nature.
The obligations which arise from a fact, personal to him who is bound, or relative to him, result either from quasi-contracts, or from offenses and quasi-offenses."
Applying the foregoing provisions, the Supreme Court held in Dean v. Hercules, Incorporated, 328 So.2d 69 (La.1976), that "an obligation in Louisiana is either: (1) contractual; (2) quasi-contractual; (3) delictual; (4) quasi-delictual; or (5) legal. C.C. 1760, 2292. . . . However, it can be said that the breach of any obligation (be it consensual or nonconsensual) results in legal responsibility if the law provides a sanction for that breach, for, without any sanction, the obligation is merely an imperfect or natural obligation, neither of which can be enforced by any judicial action. C.C. 1757." Therefore a legal obligation must be based on the principles of (1) Conventional Obligations (C.C. Articles 1761-2291); (2) Quasi-Contracts (C.C. Articles 2293-2314); or (3) Offenses and Quasi-Offenses (C.C. Articles 2315-2324).
In determining the applicable prescriptive period (tort or contract) in an action pursuant to La.C.C. Article 667, which imposes liability on an owner for works on his land causing damage to a neighbor, Dean held that, "An action for damages for a violation of Article 667 is most closely associated with an action for damages based on C.C. 2315 et seq." On this reasoning, Dean held that breach of the statutory duty imposed by Article 667 fell within the category of offenses and quasi-offenses mentioned in Article 2292. So finding, Dean applied the one year prescriptive period applicable in tort actions.
Applying the rationale of Dean, it is my opinion that the non-consensual relationship asserted herein arises from an act personal to one bound by a statutory duty. It is, therefore, neither contractual nor quasicontractual.
Additionally, I find that Appellant's action falls within the broad scope of fault as contemplated by La.C.C. Article 2315, our basic tort law. Pursuant thereto, the elements of a cause of action are fault, causation and damage. Weiland v. King, 281 So.2d 688 (La.1973).
Appellant alleges a statutory duty owed him, as a potential bidder, by Defendants, particularly the duty of complying with the statutory format for procuring food for public school lunch rooms. Appellant also alleges Defendants' breach of duty in awarding contracts to other than low bidders and the discriminatory and illegal removal of Appellant from Defendants' list of approved bidders. Such a breach of duty encompasses the risk of the type of harm alleged to have been suffered by Appellant. Thus, all elements of a cause of action in tort have been alleged.
Analogous situations are also recognized as "fault". See, Fault: A Common Name for Different Misdeeds, Professor Andre Tunic, 49 Tul.Law Rev. 279, 284 (1975), in which it is suggested that: "In cases of this kind, common sense imposes the label of fault, despite the difficulty of the decision as to legality and the good faith of the offender."
For further treatment of the broad scope of fault, see Ferdinand Fairfax Stone, Tort Doctrine in Louisiana: The Materials for the Decision of a Case, 17 Tul.Law Rev. 159 (1942); F. Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.Law Rev. 1 (1952); Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971). In Langlois, the court noted: "Because of the difficulty in defining fault for all times and purposes and instead of defining *11 fault by listing numerous activities which constitute fault . . . our law has left this determination in the hands of the court. However, our lawmakers have provided us with numerous standards of fault in the Civil Code, in statutory law, and in ordinances. Fault is not limited to moral wrongs but encompasses many acts which are merely forbidden by law." (Emphasis by the court).
I would therefore reject the plea of sovereign immunity on the ground that the action asserted is one in tort.

ON THE MERITS
Appellant's request for injunctive relief is predicated on alleged violation of La.R.S. 38:2211, La.R.S. 17:195, and Federal Regulations found at 7 C.F.R. 210.19A. I agree with the majority finding that defendants are not subject to the advertising requirements of R.S. 38:2211 because purchases of food are exempted therefrom pursuant to the special provisions of R.S. 17:195. Defendants are, however, bound by the provisions of La.R.S. 17:195 which require purchases of food at the lowest quoted wholesale price. Contrary to the majority interpretation, I find no merit in Defendants' contention that the statutory use of the disjunctive "or" in the statute permits acceptance of any bid provided the price paid is "no greater than the wholesale rate". Such an interpretation would render meaningless the requirement that purchases be awarded at the lowest quoted wholesale price and make an empty gesture of a purchaser's request for bids. Considering the obvious purpose of the statute, it can be reasonably interpreted to mean only that a school board is required to accept the lowest wholesale bid for good quality products. Although La.R.S. 17:195 is an exception to La.R.S. 38:2211, its intent is somewhat the same, namely, to protect the public fisc by insuring payment of the lowest price for products purchased pursuant to its peculiar provisions.
Additionally, Defendants are bound by Federal regulations found at 7 C.F.R. 210.19A since, admittedly, federally contributed funds are expended in the purchase of food for school lunch programs. These regulations do not require advertisement for bids in the usual manner; they permit negotiations of food purchase contracts under certain circumstances including: (1) public exigencies which do not admit of the delays attending advertisement (Section 210.19A[j][4][i]); (2) purchase of highly perishable materials (Section 210.19A[j][4][vi]); and (3) where negotiation is otherwise authorized by applicable Federal or State law, rules or regulations (Section 210.19A[j][4][vii]). The procurement of food for school lunch programs falls within all three of the above noted exceptions. La.R.S. 17:195 is within the scope of exception (3), above.
Further, Section 210.19A(1) of the applicable Federal regulation requires that "The procurement records of files of State agencies for negotiated purchases in amounts in excess of $10,000.00 shall provide at least the following information: (i) justification for the use of negotiation in lieu of advertising, (ii) contractor selection, (iii) the basis for the cost or price negotiated." While the record does not specifically show Defendants' failure to comply with the foregoing provisions, it is clear that Defendants must adhere thereto. Additionally, the Federal regulations include restrictions on purchases similar to those contained in our State statute. Namely, they require State agencies to conduct transactions "in a manner so as to provide maximum free competition", Section 210.19A(d), and to make contracts "only with responsible contractors who possess potential ability to perform successfully under the terms and conditions of a proposed procurement . . ." considering such things as "contractor integrity, record of past performance, financial and technical resources, and accessibility to other necessary resources". Section 210.19A(k).
While Defendants have complied with the regulations requiring dealing only with responsible bidders, I believe that Defendants' procedures do not fully promote free and open competition.
*12 In removing Appellant from their approved bidders list for certain infractions, Defendants countenanced infractions of a similar nature by Appellant's competitor without imposing like penalty on the competitor. Although the record contains evidence of some extenuating circumstances, I do not feel that they justify a distinction. Lastly, under slightly mitigating circumstances, Defendants have, on occasion, made purchases from Appellant's competitor at prices higher than those bid by Appellant.
Appellant's request for reinstatement to Defendants' approved bidders list for the school term 1975-1976 has been rendered moot by the lapse of that school period. I believe that Appellant is, however, entitled to reinstatement on Defendants' present approved bidders list if Appellant has not already been so reinstated.
I therefore respectfully dissent from the majority finding that the School Board's procedure for procuring food for the school lunch program complied with state and federal regulations.